Gregory B. Noble, Esq. (8359)
R. Daniel Bause, Esq. (9804)
O'CONNOR, PARSONS, LANE, & NOBLE, LLC
959 S. Springfield Ave., Second Floor
Springfield, New Jersey 07081
(908) 928-9200
Attorneys for Plaintiff

| | |
|---|---|
| DR. NABIL ADAM, <br><br> Plaintiff, <br><br> v. <br><br> RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, <br><br> Defendant. | UNITED STATES DISTRICT COURT <br> DISTRICT OF NEW JERSEY <br> CASE NO.: <br><br> <u>Civil Action</u> <br><br> **COMPLAINT AND** <br> **JURY DEMAND** |

## PARTIES AND JURISDICTION

1.      Plaintiff Dr. Nabil Adam ("plaintiff" or "Dr. Adam") is a citizen of New York as he principally resides at 63 Knickerbocker Road, Manhasset, New York 11030 and at all times relevant hereto was employed by defendant Rutgers, The State University.

2.      Defendant Rutgers, The State University of New Jersey ("Rutgers" or the "University") is a public university and a citizen of New Jersey as they have the principal business address of 57 US Highway 1, New Brunswick, NJ 08901, which had the plaintiff in its employ during the relevant time periods herein.

3.      Jurisdiction is conferred upon this Court by 28 U.S.C. § 1332, as the matter in controversy in this matter is more than $75,000 and complete diversity of citizenship exists given that plaintiff is a citizen of New York and defendant Rutgers is a citizen of New Jersey.

1

4.     Furthermore, this Court also has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et seq.  Additionally, this Court has supplemental jurisdiction over plaintiff's claims brought under New Jersey state law, including the New Jersey Law Against Discrimination, pursuant to 28 U.S.C. § 1367, as they are related to the claims in this action within the Court's original jurisdiction such that they form part of the same case or controversy.

## **VENUE**

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as Defendant Rutgers, The State University is located in this judicial district, and a substantial part of the events giving rise to this claim occurred in this judicial district.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

6.     Plaintiff is 77 years old.

7.     In or about 1975, Dr. Adam became an Assistant Professor at Rutgers and began a long and illustrious career with the University, working his way up to the titles of Distinguished Professor, Vice-Chancellor for Research & Collaborations at the Rutgers-Newark campus and Founding Director of the Rutgers Institute of Data Science, Learning, and Applications (I-DSLA).

8.     In or about Summer 2015, "Jane Doe" (this name being fictitious pursuant to prior Court Order but representing a known individual) began a PhD program at Rutgers and shortly thereafter became a research assistant to Dr. Adam, also serving as his Teaching Assistant in the Spring 2017 semester in the Data Science for Machine Learning course.

9.     Thereafter, in or about May/June 2017, after performing as Dr. Adam's research assistant for approximately two (2) years, Ms. Doe's attitude towards Dr. Adam changed, leading to a course of bizarre stalkerish and sexually harassing behavior that continued and worsened thereafter.

10.     Specifically, in or about this time period, Ms. Doe began sending Dr. Adam bizarre text messages, appearing to become increasingly possessive of their relationship.

11.     While such behavior was curious to Dr. Adam, same did not stand out as inappropriate at first.

12.     However, on or about July 1 and/or 2, 2017, Ms. Doe escalated her harassment and stalking of Dr. Adam via numerous mediums, even beginning to falsely claim that the two had some physical and/or sexual relationship.

13.     After one such email, Ms. Doe allegedly blacked out, allegedly wandering into the street and ending up admitted to a local hospital.

14.     On or about July 3, 2017, a formal complaint was made by Ms. Doe against Dr. Adam after emails were forwarded to the Office of Employment Equity ("OEE") by Dr. Jaideep Vaidya falsely alleging sexual misconduct by Dr. Adam, including "physically getting involved with [her]" and "sleeping" with her.

15.     Nonetheless, despite this false complaint, on or about July 5, 2017, Ms. Doe continued to escalate her harassment and stalking of Dr. Adam with bizarre and/or inappropriate communications.

16.     On or about July 7, 2017, OEE contacted Ms. Doe, who thereafter recanted all allegations of impropriety made against Dr. Adam and informed OEE that she had "lied" in a meeting concerning her complaint.

17.     As a result of this continued and bizarre behavior, Ms. Doe was instructed by OEE to avoid contact with Dr. Adam as the investigation goes forward.

18.     However, despite this warning, between July 8, 2017 and July 26, 2017, Ms. Doe continued to harass and stalk Dr. Adam, continuously calling him approximately thirty times per day until he would eventually answer.

19.     Ms. Doe also continued to send bizarre personal, unwanted and inappropriate text messages to Dr. Adam during this period, including maintaining such things as "I never want to lose you for any reason what so ever."

20.     Dr. Adam continued to not respond to these messages.

21.     On or about July 27 and 28, 2017, Ms. Doe bombarded Dr. Adam with a litany of harassing text messages throughout the night, including threatening to not withdraw her frivolous complaint unless Dr. Adam divorced his wife and saying that he should "rather kill [her]" than reject her further.

22.     Dr. Adam continued to not respond to these messages.

23.     After this harassment continued into the following day, on or about July 28, 2017, Ms. Doe continued her bizarre and harassing campaign, texting Dr. Adam such things as that she wished he "could understand how much [she] love[d] [him]" and that she would "leave behind everything and anything just for [him]."

24.     Even more alarming was that Ms. Doe began making threats against Dr. Adam to have him arrested under false charges, indicating that RUPD was going

to "pick" Dr. Adam up after she made a report to them and that "sorry it had to come to this" after continuing to plead for what appears to be personal and/or romantic affection without any reply by Dr. Adam.

25.    On or about July 29, 2017, after this campaign of harassment continued, Dr. Adam placated Ms. Doe and agreed to meet her and immediately informed the OEE regarding her recent behavior, indicating that he feared that if he did not go forward with the meeting Ms. Doe would harm herself.

26.    OEE contacted the Kearney Police Department, advising them that Ms. Doe had expressed the desire to self-harm herself.

27.    After the police visited her home, Ms. Doe attempted to contact Dr. Adam via phone approximately 25 times, also sending a text that she was going to come to Dr. Adam's home.

28.    In further text messages, Ms. Doe continued to threaten Dr. Adam, including saying that she was going to the police and chillingly "God help you today" and "You can't imagine what is coming."

29.    Later that day on or about July 29, 2017, Ms. Doe made contact with RUPD and later with the Third Precinct of Nassau County, which is where Dr. Adam's home is located, attempting to have the police make an unnecessary wellness check on Dr. Adam.

30.    Ms. Doe also attempted to make contact with Dr. Adam's wife and one of his colleagues to determine his whereabouts.

31.    At some point, Ms. Doe took public transportation to Dr. Adam's town, going to his home uninvited and clearly not at the prompting of the police.

32.     However, Dr. Adam was luckily not at his home at the time when Ms. Doe attempted to gain entry.

33.     Notably, Dr. Adam's neighbor who lived across the street took a picture of Ms. Doe standing on Dr. Adam's property. When questioned by the investigator, she initially denied that she had reached out to Dr. Adam, but later conceded she went to his home when the investigator advised her of the picture of her standing on his property.

34.     Later that night on or about July 29, 2017, someone purporting to be Ms. Doe's father contacted Dr. Adam, indicating that "she will kill herself if you don't respond immediately" to her harassing and stalking behavior.

35.     Upon information and belief, Ms. Doe in fact sent this email purporting to be her father.

36.     Dr. Adam informed OEE of this email and OEE contacted Kearney police on his request.

37.     Nonetheless, on or about July 30, 2017, Ms. Doe continued her harassing campaign, threatening to commit suicide again.

38.     Upon information and belief, Ms. Doe later denied ever having thoughts of ending her life.

39.     Notably, Ms. Doe has consistently denied any romantic relationship with Dr. Adam and has also denied being subjected to any harassment.  This was affirmed on or about August 11, 2017, in a text to Dr. Adam and on or about August 15, 2017, in an email to Lisa Grosskreutz, Director of Rutgers OEE.

40.     On or about September 15, 2017, after their investigation was completed into Ms. Doe's complaint, OEE issued a report finding that Dr. Adam was not in violation of any University policy and instead finding that Ms. Doe "denied that she had a romantic relationship with Dr. Adam" and that she admitted that she had "lied."  The report also found that Ms. Doe, who levied the complaint, violated the University Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking and Related Misconduct.

41.     In so finding, the OEE report noted that Ms. Doe's "credibility in general is seriously called into question.." and that she had admitted to making false accusations.

42.     Furthermore, this OEE report maintained that "Ms. Doe violated the Sexual Misconduct Policy by stalking Dr. Adam" and that "… Ms. Doe had no reservations about threatening to harm herself to exert her will on Dr. Adam."

43.     Further, the report indicated that "…Ms. Doe also violated the harassment prong of the Sexual Misconduct Policy, in that the conduct described above created an intimidating and hostile environment for Dr. Adam. Her constant calls and texts were disturbing on a base level and, if continued would have rendered Dr. Adam unable to effectively work. While he opted not to file a complaint, Dr. Adam did admit that he wanted Ms. Doe to stop contacting him. He also admitted that he did not wish to work with her in the future."

44.     These findings were cited with approval on or about February 8, 2019, when third-party investigator Christine Almafe issued a report finding "support" for the conclusions of the OEE.

45.     Despite this confirmation of Ms. Doe's harassment, stalking, and false self-hard threats, there was no follow up action from Rutgers.

46.     Although the OEE had found that she was the individual in violation of University policy, from October 2017 through November 2017 Ms. Doe continued to exhibit harassing and stalkerish behavior in a similar fashion to the acts maintained above.

47.     On or about November 27, 2017, Ms. Doe refiled her complaint against Dr. Adam.

48.     Although she had previously admitted that the allegations were fabricated and had issued the aforementioned report finding that she was the individual who in fact violated University policy, the OEE nonetheless initiated another investigation.

49.     Despite the foregoing clearly establishing that it was Ms. Doe and not Dr. Adam who was the individual who was sexually harassing and stalking the other party, on or about November 28, 2017, Dr. Adam was placed on administrative leave pending the investigation.

50.     On or about March 18, 2018, Dr. Adam filed a harassment and stalking complaint with the OEE against Ms. Doe, alleging continuing harassment that extended well past the September 15, 2017 OEE report.

51.     Specifically, although this complaint encompassed the prior instances of stalking and harassment that occurred in or around the Summer of 2017, it also raised new and concerning harassment and stalking behavior that occurred following the September report, including numerous emails sent in November 2017 and

8

numerous phone calls during October and November 2017, thus constituting new allegations that needed to be investigated and subjected to scrutiny beyond what had been explored in the prior OEE report.

52.     Nonetheless, on or about April 5, 2018, Director of OEE Lisa Grosskreutz emailed Dr. Adam following his complaint and indicated that same would not be investigated given that Dr. Adam had decided to not pursue anything against Ms. Doe in 2017 and that a violation had nonetheless been found in September 2017, not recognizing that Dr. Adam had made the March 2018 complaint due to the fact that he had become concerned about no action being taken to address what amounted to continuing harassment past the September 15, 2017 report date despite Rutgers' knowledge that same was in fact occurring.

53.     Therefore, alarmingly no action was taken by OEE to address Dr. Adam's continuing concerns, including clear allegations which had never been investigated.

54.     In or about March 2018, Dr. Adam received a new National Science Foundation ("NSF") grant in the amount of $750,000 based on the successful proposal he submitted in or about June 2017 as the Principal Investigator ("PI").

55.     Thereafter, Executive Vice Chancellor and Provost Jerome Williams assigned another individual to replace Dr. Adam as the PI of the grant.

56.     As per the NSF Office of Inspector General in an email of November 2019, the fact that Dr. Adam shared with Ms. Doe copies of NSF proposals assigned for review, "does not preclude [Dr. Adam] from serving as a PI in any current or future award, nor does it preclude [him] from applying for future NSF grants and projects."

57.     On or about April 17, 2018, OEE issued another report which found that Ms. Doe's allegations of sexual assault could not be corroborated and that Dr. Adam did not retaliate against her.

58.     Ridiculously, this report appeared to cite Dr. Adam for allegedly not reporting the sexual assaults that Ms. Doe had alleged, which he obviously knew did not occur, and which Rutgers did not find had occurred in the very same report, foreshadowing the further harassment and retaliation that was to come by Rutgers.

59.     Nonetheless, on or about May 22, 2018, Dr. Adam was removed from his position of Vice Chancellor for Research and Collaborations, Rutgers-Newark, thus cutting his salary substantially, and was also suspended without pay by Rutgers for the Fall 2018 semester by the decision of Jerome Williams.

60.     Dr. Adam was also stripped of his teaching, advising and supervisory responsibilities as of this date, with his name and biography being removed from the University website.

61.     According to Rutgers, these actions were allegedly taken due to the fact that Dr. Adam had allegedly not self-reported Ms. Doe's allegations.

62.     Meanwhile, these allegations were very clearly reported by both Dr. Adam and Ms. Doe as maintained above and were also clearly of the type that Dr. Adam knew were patently false, which was further supported by Rutgers' own findings.

63.     On or about April 18, 2018, Chancellor Nancy Cantor used her position to vilify Dr. Adam and defamed him by speaking to the press about an ongoing

confidential investigation and discussing personnel matters, disregarding the absence of a finding of any harassment or assault by Dr. Adam.

64.     In or about July 2018, Dr. Adam filed a grievance against RU which reflected similar concerns found in the March 2018 complaint, including that no action was taken by Rutgers and that he was now being retaliated against, which allowed the harassment and stalking to continue.

65.     On or about August 13, 2018, Ms. Doe filed a retaliation complaint against both Dr. Adam and Dr. Pereiklis Papakonstantinou.

66.     Thereafter, on or about August 18, 2018, Ms. Doe filed a lawsuit against Rutgers, Dr. Adam and Dr. Papakonstantinou, which contained numerous factual inaccuracies and outright lies concerning Dr. Adam.

67.     Following these renewed filings, on or about August 28, 2018, Dr. Adam filed an additional harassment and privacy violation complaint against Ms. Doe.

68.     On or about August 29, 2018, Dr. Adam filed an additional complaint.

69.     On or about September 5, 2018, Dr. Adam presented to a committee of department chairs (the "committee") challenging his suspension, with the committee thereafter recommending against the punishment levied by Jerome Williams in his May 22, 2018 letter and indicating that no further punishment was warranted.

70.     Thereafter, on or about September 14, 2018, and September 16, 2018, Dr. Adam filed complaints regarding confidentiality and retaliation against Ms. Doe relating to her leaking information concerning the various investigations to the press.

11

71.     On or about September 19, 2018, Jerome Williams upheld his prior suspension and stripping of Dr. Adam's title in its entirety, ignoring the committee's recommendation.

72.     Following this ridiculous decision, on or about September 26, 2018, Dr. Adam appealed the decision to uphold his suspension without pay and the other findings by Jerome Williams.

73.     However, on or about October 4, 2018, Barbara Lee, Senior VP for Academic Affairs, issued a letter and decision as to Dr. Adam's appeal of his punishments, denying same and upholding the suspension and other punishments.

74.     On or about January 10, 2019, Jerome Williams issued a letter regarding Dr. Adam's return to work for the Spring 2019 semester which stripped his teaching, advising and/or supervisory responsibilities and instilled the aforementioned stripping of his title and decrease in salary.  Dr. Adam was also denied his title and responsibility as the Founding Director of the Rutgers Institute for Data Science, Learning, and Applications (I-DSLA).

75.     Furthermore, Dr. Adam was further restricted as to when he could come and go from the school and had other similar restrictive limitations placed upon his employment.

76.     On or about February 21, 2019, correspondence was sent on Dr. Adam's behalf by counsel substantially outlining the facts contained herein and alleging violations of the New Jersey Law Against Discrimination by the University for hostile work environment-sexual harassment, age discrimination and retaliation through Rutgers' action and/or inaction.

77.     On or about February 27, 2019, outside counsel for Rutgers issued a report on Rutgers' behalf in response to Dr. Adam's grievance against Rutgers filed in or about July 2018.  The report stated, in part, "… [i]t is also true that the OEE report for case No. 2017-111, issues on September 15, 2017, included a finding that Ms.  [Doe] had violated the Sexual Misconduct Policy.  More specifically, OEE concluded that Ms. [Doe] had engaged in stalking of Dr. Adam, demonstrating "manipulative and controlling behavior" toward and threatening Dr. Adam and engaging in "frequent non-consensual contact toward Dr. Adam.  OEE also found Ms. [Doe] had created an intimidating and hostile environment for Dr. Adam.  While as noted above, we have not been retained to revisit these findings, we agree with them."

78.     Thereafter, Ms. Doe continued to exhibit harassing and stalkerish behavior, such as going to locations on school grounds of which she was ordered to avoid and which Dr. Adam was working, from in or about February 2019 through April 2019.

79.     As a result of this continuing harassment, Dr. Adam filed various complaints with administration officials as to the continuing harassment, stalking and hostile work environment, even calling Rutgers University Police Department on or about March 26, 2019 and filing a report regarding Ms. Doe's behavior.

80.     These complaints were both made officially through the OEE procedures as maintained above and through numerous emails to other Rutgers' officials and members of management alleging both harassment by Ms. Doe and

13

further retaliation by Rutgers, including the provision of specific details regarding such harassment and retaliation.

81.     Nonetheless, on or about April 9, 2019, Rutgers further retaliated against Dr. Adam through the filing of a University Action Complaint against him stemming from continuing fabricated allegations from Ms. Doe about his alleged behavior in lieu of simply addressing his valid concerns.

82.     Thereafter, in further retaliation, on or about May 9, 2019, based upon alleged "newly-discovered evidence," Rutgers reopened their investigation into Ms. Doe's 2017 complaint, placing Dr. Adam onto administrative leave, which he remains on until this day.

83.     On or about May 21, 2019, in further retaliation, Rutgers denied Dr. Adam payments due to him from his NSF grants ($300,000 and $749,384) where he is the PI and National Institutes of Health ("NIH") grant ($1,072,401) where he is a Co-PI.

84.     Ms. Doe also amended her allegations in this reopened complaint on or about July 23, 2019, further fabricating alleged improprieties on Dr. Adam's behalf.

85.     During this same timeframe beginning in or about May 2019, Rutgers set forth on this baseless investigation into this alleged "newly-discovered evidence" as presented by alleged witness Dr. Javier Cabrera.

86.     After retaining outside counsel to conduct this investigation into this alleged "newly-discovered evidence," same unnecessarily extended over several months while Dr. Adam remained on administrative leave until reports were

eventually issued on or about February 25, 2020, regarding this reopened inquiry, including as to the new allegations of Dr. Cabrera.

87.     Notably, these reports seemingly did not change any prior conclusions by Rutgers inasmuch as same did not find that Dr. Adam engaged in impermissible sexual harassment.

88.     In  fact, one report explicitly indicates "Ms. [Doe] stalked Dr. Adam in violation of the Sexual Misconduct Policy, and retaliated against him in violation of the Discrimination and Sexual Misconduct Policies."

89.     Furthermore, setting aside the fact these reports did not come to the aforementioned crucial findings, the subject investigation was heavily reliant on biased, inconsistent and compromised testimony and came to other illogical, bad faith conclusions intent on targeting Dr. Adam based upon information provided by Dr. Cabrera while attempting to shield Rutgers from liability.

90.     As of to date, OEE ignored and has not responded to Dr. Adam's April 22, 2020 complaint submitted against Dr. Javier Cabrera for lying and making false statements against Dr. Adam.

91.     Despite the foregoing and the lacking conclusions of this reopened investigation, Rutgers continues to retaliate against Dr. Adam to the present time, including, but not limited to, keeping him on administrative leave, not allowing him to perform his work and research functions and continuing to advance baseless investigations and allegations.

92.     Furthermore, based upon the foregoing actions of Rutgers and the destruction of his reputation, plaintiff has seen his professional and/or business

opportunities undercut, up to and including efforts to obtain grants and/or funding and other professional pursuits.

## FIRST COUNT

### New Jersey Law Against Discrimination
### Hostile Work Environment – Gender and/or Sexual Harassment

93.     Plaintiff repeats and realleges each and every allegation of the within paragraphs of this Complaint as if set forth at length herein.

94.     Pursuant to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. ("LAD"), defendants are liable for the acts constituting hostile work environment – gender and/or sexual harassment created within plaintiff's workplace and/or area of public accommodation as maintained and controlled by defendants and their agents, representatives and/or employees.

95.     As set forth herein, defendants created and perpetuated a severe and pervasive work environment based upon regular and continuous incidents involving "Jane Doe", a University student and/or employee, wherein Dr. Adam was subjected to repeated and unwanted sexual advances, commentary, harassment,  stalking and/or other misconduct within said workplace and/or area of public accommodation or in related contexts and/or environments connected to the University.

96.     Furthermore, upon resisting and/or complaining to Rutgers about this harassment and/or discrimination that he was subjected to, Dr. Adam suffered substantial adverse employment actions, up to and including demotions, pay-cuts, suspensions, stripping of titles and responsibilities and/or changes in his work schedule.

16

97.    Defendant failed to implement any preventative or remedial measures to protect against unlawful harassment, and discrimination, including, but not limited to:

(a)    failure to institute or implement effective policies or procedures regarding gender and sexual harassment and the reporting and investigation of complaints of same;

(b)    failure to adequately monitor or supervise the illegal activities and discriminatory actions of personnel and/or other individuals within Dr. Adam's workplace;

(c)    failure to provide adequate training to recognize, address, rectify and/or prevent illegal, harassing or discriminatory conduct; and

(d)    failure to adequately rectify, discipline or prevent known discriminatory conduct within the workplace.

98.    The conduct engaged in by defendants constitutes egregious behavior and/or willful indifference by upper management to the rights of plaintiff sufficient to subject defendants to punitive damages under the LAD and Lehman v. Toys 'R' Us.

99.    Plaintiff has been severely injured as a result of such harassment and discrimination that he has suffered, and continues to suffer, severe emotional distress, humiliation, embarrassment, anguish, physical and bodily injuries, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result

17

of defendant's hostile work environment gender and/or sexual harassment in violation of the LAD as follows:

> (a)  full compensation for back pay and benefits with full remuneration, with interest;

> (b)  full compensation for front pay and benefits with full remuneration, with interest;

> (c)  compensatory damages;

> (d)  consequential damages;

> (e)  punitive damages;

> (f)  attorneys' fees with appropriate enhancement under <u>Rendine v. Pantzer</u>, 141 <u>N.J.</u> 292 (1995); and

> (g)  such other relief as may be available pursuant to the LAD in which this court deems to be just and equitable.

## SECOND COUNT

### New Jersey Law Against Discrimination
### Unlawful Retaliation

100.  Plaintiff repeats and realleges each and every allegation of the within paragraphs of this complaint as if set forth at length herein.

101.  As set forth herein, because plaintiff resisted and objected to the various instances of harassment and discrimination within his workplace, he was subjected to substantial adverse employment actions by Rutgers, up to and including demotions, pay-cuts, suspensions, placement on administrative leave, stripping of titles and responsibilities and/or changes in his work schedule.

102.   Defendants' actions towards plaintiff, specifically the aforementioned adverse employment actions including demotions, pay-cuts, suspensions, placement on administrative leave, stripping of titles and responsibilities and/or changes in his work schedule, constitutes unlawful retaliation in violation of the LAD.

103.   Plaintiff was subjected to significant adverse employment actions, up to and including demotions, pay-cuts, suspensions, stripping of titles and responsibilities and/or changes in his work schedule, in direct retaliation for his complaints and/or resistance to unlawful treatment and/or actions under the LAD as outlined in detail herein.

104.   Plaintiff had a reasonable belief that such violations of the LAD was occurring and was thereafter subjected to adverse action in retaliation of same.

105.   As further outlined herein, following counsel's sending of correspondence on plaintiff's behalf outlining such violations of the LAD in detail, plaintiff has been subjected to further retaliation at the hands of the defendants in that he has sustained further adverse action by Rutgers, including the suspension of his employment without pay and other such actions substantially altering the terms and conditions of his employment.

106.   As such, defendants' actions towards plaintiff, specifically the adverse employment actions taken against plaintiff by Rutgers as outlined at length herein, constitutes unlawful retaliation in violation of the LAD.

107.   Plaintiff has been severely injured as a result of such retaliation that he has suffered, and continues to suffer, physical and bodily injuries, severe emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social

disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's unlawful retaliation as follows:

(a) full compensation for back pay and benefits with full remuneration, with interest;

(b) full compensation for front pay and benefits with full remuneration, with interest;

(c) compensatory damages;

(d) consequential damages;

(e) punitive damages;

(f)  pre-judgment interest;

(g) attorneys' fees with appropriate enhancement under <u>Rendine v. Pantzer</u>, 141 <u>N.J.</u> 292 (1995); and

(h)      such other relief as may be available pursuant to the LAD in which this court deems to be just and equitable.

### THIRD COUNT

### New Jersey Law Against Discrimination

### Unlawful Retaliation – Failure to Conduct a Fair and Impartial Investigation

108.    Plaintiff repeats and realleges each and every allegation of the within paragraphs of this Complaint as if set forth at length herein.

109.    <u>N.J.S.A.</u> 10:5-12(d) specifically prohibits any employer from taking

20

action to "…threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

110.   Amongst other things, the LAD and New Jersey Supreme Court precedent and/or other common law cases interpreting the LAD require that employers and/or other related entities conduct thorough and fair investigations into allegations of sexual harassment and come to any conclusions in good faith following same, thus bestowing employees the explicit right to such good faith and reasonable investigations under the law.

111.   As described above, Rutgers and its agents have engaged in continuous bad faith investigations into the various complaints in this matter from plaintiff and otherwise, including but not limited to the February 25, 2020 Cabrera reports, the April 17, 2018 report of the OEE and the September 15, 2017 report of the OEE, proceeding in a slip-shod and incomplete manner and reaching predetermined conclusions in bad faith that relied almost exclusively on biased, compromised and/or incomplete evidence.

112.   By not engaging in such good faith efforts to thoroughly and fairly engage in such a fair investigation into complaints by and involving plaintiff and thereafter taking adverse action against plaintiff following certain bad faith conclusions, defendant Rutgers violated the LAD and retaliated against plaintiff for his assertion of rights under the statute.

113.   Plaintiff has been severally injured as a result of such retaliation that he has suffered, and continues to suffer, physical and bodily injuries, severe emotional

21

distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's unlawful retaliation and violation of the LAD as follows:

(a)     full compensation for back pay and benefits with full remuneration, with interest;

(b)     full compensation for front pay and benefits with full remuneration, with interest;

(c)     compensatory damages;

(d)     consequential damages;

(e)     punitive damages;

(f)     pre-judgment interest;

(g)     attorneys' fees with appropriate enhancement under Rendine v. Pantzer, 141 N.J. 292 (1995); and

(h)     such other relief as may be available pursuant to the LAD in which this court deems to be just and equitable.

## FOURTH COUNT

### New Jersey Law Against Discrimination

### Age Discrimination

114.   Plaintiff repeats and realleges each and every allegation of the within paragraphs of this complaint as if set forth at length herein.

115.   Plaintiff was a member of a protected class under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD"), because he was 75 at the time Rutgers began taking a litany of adverse employment actions against him, up to and including demotions, pay-cuts, suspensions, placement on administrative leave, stripping of titles and responsibilities and/or changes in his work schedule.

116.   Defendant Rutgers is an "employer" as defined under the LAD.

117.   Plaintiff was subjected to repeated adverse employment actions, including demotions, pay-cuts, suspensions, placement on administrative leave, stripping of titles and responsibilities and/or changes in his work schedule, based upon his age in violation of the LAD.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's age discrimination in violation of the LAD as follows:

    a.    full compensation for back pay and benefits with full remuneration, with interest;

    b.    full compensation for front pay and benefits with full remuneration, with interest;

    c.    compensatory damages;

    d.    consequential damages;

    e.    punitive damages;

    f.    pre-judgment interest;

    g.    his attorneys' fees and costs with appropriate enhancement under Rendine v. Pantzer, 141 N.J. 292 (1995); and

h. such other relief as may be available pursuant to the LAD in which this court deems to be just and equitable.

## FIFTH COUNT

**Violation of Public Policy
Common Law Pierce Claim**

118. Plaintiff repeats and realleges each and every allegation of the within paragraphs of this Complaint as if set forth at length herein.

119. By and through the actions described above, defendants took various adverse employment actions against plaintiff, up to and including demotions, pay-cuts, suspensions, placement on administrative leave, stripping of titles and responsibilities and/or changes in his work schedule, in violation of a clear mandate of public policy, thereby violating New Jersey Common Law.

120. Specifically, the public policy of the State of New Jersey by and through New Jersey Supreme Court precedent and/or other common law cases interpreting the LAD requires that employers and/or other related entities conduct thorough and fair investigations into allegations of sexual harassment and come to any conclusions in good faith following same.

121. As described above, Rutgers and its agents have engaged in continuous bad faith investigations into the various complaints in this matter, including but not limited to the February 25, 2020 Cabrera reports, the April 17, 2018 report of the OEE and the September 15, 2017 report of the OEE, proceeding in a slip-shod and incomplete manner and reaching predetermined conclusions in bad faith that relied almost exclusively on biased, compromised and/or incomplete evidence.

122. By not engaging in such good faith efforts to thoroughly and fairly engage

in such a fair investigation and thereafter taking adverse action against plaintiff following certain bad faith conclusions, defendant Rutgers violated this clear public policy and caused harm to plaintiff.

123.   As a result of defendants' illegal actions in regards to his employment, plaintiff has suffered, and continues to suffer, economic loss, harm to career, harm to reputation, bodily injury with physical manifestations, severe emotional distress, and physical pain and suffering, as well as all other such damages compensable at law.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's violation of New Jersey Common Law, Public Policy and/or the decision in Pierce as follows:

a.   full compensation for back pay and benefits with full remuneration, with interest;

b.   full compensation for front pay and benefits with full remuneration, with interest;

c.   compensatory damages;

d.   consequential damages;

e.   punitive damages;

f.   pre-judgment interest;

g.   his attorneys' fees and costs with appropriate enhancement; and

h.   such other relief the court may deem equitable and just.

## SIXTH COUNT

**Unlawful Interference with Prospective Economic Advantage**

25

124.   Plaintiff hereby incorporates each and every allegation of the within paragraphs of this Complaint as if they were fully set forth at length herein.

125.   Plaintiff had a reasonable expectation of economic advantage during the course of his employment with defendant, including but not limited to obtaining grants, funding and/or other professional and/or business opportunities.

126.   The defendants had knowledge of such expectancy of economic advantage.

127.   The defendants wrongfully and without justification interfered with plaintiff's expectancy of economic advantage. The defendants actually conspired to sabotage plaintiff's employment, destroy his reputation, block his receipt of grant payments, frustrate his efforts to obtain grants and/or funding and prevent him from pursuing various professional opportunities.

128.   In the absence of the wrongful acts of defendant and its agents, it is reasonably and probable that the plaintiff would have realized his economic advantage.

129.   Because of the wrongful acts of defendants as referenced herein, defendant wrongfully interfered with plaintiff's ability to earn a living and realize his fully economic potential and advantage while employed by defendant.

130.   Plaintiff has sustained damages as a result of defendant's conduct.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's interference with prospective economic advantage:

a.   Compensatory damages;

b.     Consequential damages;

c.     Attorneys' fees and cost of suit with appropriate enhancement;

d.     Pre-judgment Interest;

e.     Punitive damages;

f.     Any other such other relief the court may deem equitable and just.

## SEVENTH COUNT

### Violation of Title IX – 20 U.S.C. § 1681, et seq.

### Discrimination and/or Sexual Harassment

131.    Plaintiff hereby incorporates each and every allegation of the within paragraphs of this Complaint as if they were fully set forth at length herein.

132.    Defendant Rutgers does and has received federal financial assistance through Title IX during all relevant times mentioned herein.

133.    Therefore, defendant Rutgers' operations are subject to the prohibition on sex discrimination and harassment under Title IX, 20 U.S.C. § 1687(2)(A).

134.    As maintained herein, defendants created and perpetuated a severe and pervasive work environment based upon regular and continuous incidents involving "Jane Doe", a University student and/or employee, wherein Dr. Adam was subjected to repeated and unwanted sexual advances, commentary, harassment, stalking and/or other misconduct within said workplace and/or area of public accommodation or in related contexts and/or environments connected to the University based upon his sex/gender.

27

135.   As aforementioned, this harassment was so severe as to be so severe and pervasive as to constitute discrimination against plaintiff based upon his sex/gender.

136.   Furthermore, upon resisting and/or complaining to Rutgers about this harassment and/or discrimination that he was subjected to, Dr. Adam suffered substantial adverse employment actions, up to and including demotions, pay-cuts, suspensions, stripping of titles and responsibilities and/or changes in his work schedule.

137.   Defendant failed to implement any preventative or remedial measures to protect against unlawful harassment, and discrimination, including, but not limited to:

(e)   failure to institute or implement effective policies or procedures regarding gender and sexual harassment and the reporting and investigation of complaints of same;

(f)   failure to adequately monitor or supervise the illegal activities and discriminatory actions of personnel and/or other individuals within Dr. Adam's workplace;

(g)   failure to provide adequate training to recognize, address, rectify and/or prevent illegal, harassing or discriminatory conduct; and

(h)   failure to adequately rectify, discipline or prevent known discriminatory conduct within the workplace.

138.   Plaintiff has been severely injured as a result of such harassment and discrimination that he has suffered, and continues to suffer, severe emotional

28

distress, humiliation, embarrassment, anguish, physical and bodily injuries, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

139.   Defendant Rutgers' acts and omissions constituted discrimination and indifference against plaintiff on the basis of his sex/gender.

WHEREFORE, plaintiff, Dr. Nabil Adam, demands judgment against defendant, Rutgers, The State University of New Jersey, for harm suffered as a result of defendant's violation of Title IX as follows:

    a.  full compensation for back pay and benefits with full remuneration, with interest;

    b.  full compensation for front pay and benefits with full remuneration, with interest;

    c.  compensatory damages;

    d.  consequential damages;

    e.  punitive damages;

    f.  pre-judgment interest;

    g.  his attorneys' fees and costs with appropriate enhancement; and

    h.  such other relief the court may deem equitable and just.

O'CONNOR, PARSONS, LANE, & NOBLE, LLC
Attorneys for Plaintiff

By: _____
GREGORY B. NOBLE

DATED:  May 6, 2020

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues.

O'CONNOR, PARSONS, LANE, & NOBLE, LLC
Attorneys for Plaintiff

By:_____
GREGORY B. NOBLE

DATED:  May 6, 2020

## DESIGNATION OF TRIAL COUNSEL

Please take notice that Gregory B. Noble, Esq. is hereby designated as trial counsel in the within matter.

## CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11

The undersigned, Gregory B. Noble, certifies to the best of his knowledge, information and belief on behalf of the plaintiff as follows:

(1) this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the complaint otherwise complies with the requirements of Rule 11.

30

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

O'CONNOR, PARSONS, LANE, & NOBLE, LLC
Attorneys for Plaintiff

By:_____
GREGORY B. NOBLE

DATED:   May 6, 2020